OBADIAH B. BROWN, PLAINTIFF IN ERROR, v. THE UNITED STATES.

THE UNITED STATES, PLAINTIFFS IN ERROR, v. OBADIAH B. BROWN.

An act of Congress passed on the 2d of July, 1836 (5 Stat. at Large, 83), directs that, where any money has been paid out of the funds of the Post-Office Department to any person in consequence of fraudulent representations or by mistake, collusion, or misconduct of any officer or clerk of the Department, the Postmaster-General shall institute a suit to recover it back.

Where the person who was the chief clerk and treasurer of the Post-Office Department transferred to the Department a deposit which he had made, in his own name, in a bank which had become broken, and in consequence of such transfer received the full value of the deposit from the Department, it was a case which fell within the statute; and the adjudication of the Postmaster-General, ordering the person to be credited upon the books and to receive the money, cannot be considered a final adjudication, closing the transaction from judicial scrutiny.

The rules and regulations of the Post-Office Department placed the whole subject of finance under the charge of the chief clerk. It was within the range of his official duties, therefore, to superintend all matters relating to finance, and he was not entitled to charge a commission for negotiating loans for the use of the Department.

THESE two cases were merely branches of a single case which was tried in the Circuit Court of the United States for the District of Columbia, holden in and for the County of Washington.

The suit was instituted by the United States against Obadiah B. Brown, upon an account, two items only of which were disputed. Upon one of these items the instruction of the court to the jury was unfavorable to Brown, and he took a bill of exceptions to it. This constituted the first case. Upon the second item, the instruction was unfavorable to the United States, and they excepted.

The account upon which the suit was brought was as follows, viz. : —

Obadiah B. Brown, late Treasurer Post-Office Department, in
Dr.                account with the United States.                Cr.

| 1835. | | | | 1845. | | |
|---|---|---|---|---|---|---|
| Jan. | 27. | To cash, | $ 2,500.00 | Mar. 31. By amount of his bill, dated 14 | | |
| Feb. | 18. | " cash, | 802.59 | February, 1835, No. 460, paid | | |
| " | 19. | " cash, | 2,088.61 | sundry persons for services | | |
| April | 10. | " cash, . | 1,452.00 | in Post-Office Department, | | $ 802.59 |
| | | | | June 26. By amount paid sundry persons | | |
| | | | | for services in Post-Office De- | | |
| | | | | partment, as per bill on file, | | 1,452.00 |
| | | | | Balance, . . . . | | 4,588.61 |
| | | | $ 6,843.20 | | | $ 6,843.20 |

To balance, $ 4,588.61

The two items in dispute were the charges of $ 2,500 and
$ 2,088.61. The first of these, viz. that of $ 2,500, is not the
first taken up in the bill of exceptions, or in the opinion of the
court. In both, the latter item of $ 2,088.61 is treated and dis-
posed of in the first instance.

The whole of the facts in the case are set forth in the two
bills of exceptions, which are recited in the opinion of the
court. It is therefore unnecessary to repeat them here.

The cause was argued in this court by the Attorney-General
(*Mr. Johnson*), for the United States, and by *Mr. Bradley* and
*Mr. Coxe*, for Mr. Brown.

*Mr. Johnson* referred to the Post-Office Act of 3d March,
1825 (4 Stat. at Large, 102), and made the following points.

1. That the fact being known to Mr. Barry, the Postmaster-
General, that the Bank of Maryland had failed, and that the
Union Bank held the certificates given to the former by the
Post-Office Department, and that the certificate to Brown given
by the Bank of Maryland was for his private account, he had
no lawful authority to assume and pay the same to Brown.

2. That if he had, in the absence of all improper intent,
there was evidence from which the jury might infer mistake of
fact, collusion, or misconduct in the Postmaster-General in
making such payment.

3. That there was no evidence from which the jury could
infer that there was any agreement to allow the defendant the
commissions claimed by him, or from which it could be al-
lowed. Gratiot *v.* The United States, 4 How. 110.

The counsel for Mr. Brown contended that, with respect to
the item of $ 2,088.61, the charge of the Circuit Court was
correct, and fell within the ruling of this court in the case of

The United States v. The Bank of the Metropolis, 15 Peters, 377, 400, 401; and with respect to the item of $2,500, they contended, —

1. The services rendered by Mr. Brown, and for which he claimed this compensation, were not such as were ordinarily attached to the duties of the office held by him.

2. They were rendered at the instance of the government, and he was obliged, under the circumstances, to perform the labor, and assume the responsibility necessary to execute that service.

3. He was entitled to an equitable allowance for such extra service, to be graduated by the amount paid for like services under similar circumstances.

4. The Department had paid for like services, under similar circumstances, more than was demanded by him.

And to sustain these propositions they relied on The United States v. Macdaniel, 7 Peters, 1 ; The United States v. Ripley, 7 Peters, 25, 26 ; The United States v. Fillebrown, 7 Peters, 44.

Mr. Justice DANIEL delivered the opinion of the court.

This case is brought before us upon writs of error to the Circuit Court of the United States for the District of Columbia, holden for the County of Washington.

The facts of this case, and the questions of law arising therefrom, will appear in the following statement of the proceedings in the Circuit Court.

In the year 1839 the United States instituted an action on the case against the defendant in error, to recover of him the sum of $4,588.61, in obedience to the directions of the seventeenth section of the act of Congress of July 2, 1836 (5 Statutes at Large, 83), which declares, " That in all cases where any sum or sums of money have been paid out of the funds of the Post-Office Department to any individual or individuals under pretence that service has been performed therefor, when in fact such service has not been performed, or by way of additional allowance for increased service actually rendered when the additional allowance exceeds the sum which, by the provisions of the law, might rightfully have been allowed therefor, and in all other cases where moneys of the department have been paid over to any person in consequence of fraudulent representations, or by mistake, collusion, or misconduct of any officer or clerk of the Department, it shall be the duty of the Postmaster-General to cause suit to be brought in the name of the United States of America to recover back the same, or the excess, as the case may be, with interest thereon."

The declaration counted upon an *insimul computassent*, upon money paid, upon money lent and advanced, and upon money had and received. The account exhibiting the claim of the United States consisted of four items, and is in the following form.

"Obadiah B. Brown, late Treasurer Post-Office Department, in Dr.                    account with the United States.                    Cr.

| 1835. | | | 1845. | | |
|---|---|---|---|---|---|
| Jan. 27. | To cash, | $ 2,500.00 | Mar. 31. | By amount of his bill, dated 14 | |
| Feb. 18. | " cash, | 802.59 | | February, 1835, No. 460, paid | |
| " 19. | " cash, | 2,088.61 | | sundry persons for services | |
| April 10. | " cash, | 1,452.00 | | in Post-Office Department, | $ 802.59 |
| | | | June 26. | By amount paid sundry persons | |
| | | | | for services in Post-Office De- | |
| | | | | partment, as per bill on file, | 1,452.00 |
| | | | | Balance, . . . . | 4,588.61 |
| | | $ 6,843.20 | | | $ 6,843.20 |

To balance, $ 4,588.61

"I certify that the foregoing is a true statement of the account of Obadiah B. Brown, late treasurer of the Post-Office Department, as audited and adjusted at this office.

" In testimony whereof I have hereunto subscribed my name, and caused to be affixed my seal of office, at Washington, this 2d day of July, in the year 1839.

"C. K. Gardiner,
*Auditor of the Treasury for Post-Office Department.*"

The second and fourth items of this account were extinguished by credits equal to their amount; the first and third items were alone contended for by the United States. The jury found a verdict for the plaintiffs for the first item, and rejected the third, under the instruction of the Circuit Court.

At the trial, bills of exception to the rulings of the court were sealed, at the instance of both the plaintiffs and the defendant, and a writ of error is prosecuted by either party in this court.

The proofs set forth in the bills of exception, and the rulings of the Circuit Court upon the prayers appended to those bills, are made a part of this statement, so far as is necessary to present the questions brought up for review.

" The plaintiffs, to sustain the issues joined on their part, and to establish their right to recover the third item in the account, of $ 2,088.61, gave evidence by competent testimony, that, on the 3d of May, 1833, the defendant made a private deposit of his own funds in the Bank of Maryland, of the sum of $ 2,000,

bearing interest at the rate of five per. centum per annum, and received a certificate therefor. That the defendant was at the time of said deposit, and continued until the 1st of February, 1835, to be, the chief clerk and treasurer of the Post-Office Department. That on the 5th of June, 1833, the Post-Office Department borrowed of the Bank of Maryland $ 50,000, payable at nine and twelve months, and gave to the said bank two certificates of $ 25,000 each, in acknowledgment of this loan. These certificates were signed by the defendant, as treasurer of the Department. That on the 22d of June, 1833, the Bank of Maryland borrowed of the Union Bank of Maryland $ 50,000, and deposited said loan certificates as collateral security, therefor.

" That on the 22d of March, 1834, the Bank of Maryland failed, and the Post-Office Department, shortly after, knew of that fact. That on the 22d of March, 1834, the Bank of Maryland made a general assignment to John B. Morris and Richard W. Gill, as trustees for the benefit of its creditors. And that both the Post-Office Department and defendant were notified of said assignment to the Union Bank of the post-office certificates, as early as the 8th of April, 1834.

" That immediately on the announcement of the failure of the Bank of Maryland, its certificates of deposit depreciated in value to the amount of eighty per cent., and continued gradually to depreciate until some three or four years after, when they had fallen as low as twenty-five per cent. That on or about the 9th of September, 1834, N. Williams, Esq., the District Attorney of the United States, and acting as such, procured to be made on said certificate of deposit given to said defendant the indorsement thereon signed by J. B. Morris and R. W. Gill.

" ' Mr. Wilson, *Cashier :* —

" ' Release the within certificate, with interest up to 22d of March, on deposit to be checked for.

" ' J. B. MORRIS,<br>R. W. GILL, *Trustees.*

" ' *3d September,* 1834.'

" And said certificate, with the indorsement of the defendant Brown, and of said Morris and Gill, was then by him presented to the Bank of Maryland by said Williams, acting as aforesaid, and the said certificate was then and by it cancelled, and a credit given for the amount, with the interest up to 22d March, 1834, to the Post-Office Department, being the amount of two

thousand and eighty-eight dollars sixty-one cents : this credit was given on the 9th of September, 1834, and in a day or two after, on the receipt of the account showing said credit, corresponding entries were made on the books of the Department, charging said bank, in general account, with said sum of two thousand and eighty-eight dollars sixty-one cents, and crediting O. B. Brown, Treasurer, &c., with the like sum." That early in February, 1835, the defendant retired from his office in the Post-Office Department, and afterwards, on the 19th of February, 1835, the Postmaster-General caused a requisition to be made out in favor of the defendant for the sum of $ 2,088.61; and upon this requisition a corresponding check was drawn, payable to his order, for the like amount, which, being indorsed by him, was duly paid, which sum so paid is that now sought to be recovered. That on or about the 5th of December, 1836, an arrangement was made between the said Union Bank and the then Postmaster-General, under which the defendant was recharged with the sum of $ 2,088.61, and the Union Bank thereupon gave the bond of indemnity in the following words.

" ' Know all men by these presents, that we, the President and Directors of the Union Bank of Maryland, and Robert Mickle, of the State of Maryland, are held and firmly bound unto the United States in the full and just sum of four thousand dollars, current money of the United States, to be paid to the said United States; to which payment, well and truly to be made, we bind ourselves and each of us, firmly and severally, by these presents. Sealed with our seals, and dated this 5th day of December, in the year 1836.

" ' Whereas, Amos Kendall, Postmaster-General of the United States, hath allowed and paid to the President and Directors of the Union Bank of Maryland the sum of two thousand and eighty-eight $\frac{61}{100}$ dollars, claimed to be due to the said bank from the Post-Office Department, which claim was disallowed by William T. Barry, former Postmaster-General of the United States, and the amount so claimed by the said bank was paid to a certain O. B. Brown by the said Barry, on the ground that a debt due to the said Brown from the Bank of Maryland could be legally set off against the claim of said Union Bank ; and the said Amos Kendall, as Postmaster-General as aforesaid, having allowed and paid the claim of said Union Bank, and recharged the said O. B. Brown with the amount so received by him, is about to sue the said O. B. Brown for the same, in which suit the validity of said set-off may be brought in question.

" 'Now, the condition of the above obligation is such, that, if the validity of said set-off should in the said suit be sustained by a judicial decision, and the said Union Bank shall thereupon, on demand, fail to repay the said sum of two thousand and eighty-eight $\frac{81}{100}$ dollars, with legal interest thereon from the time they received the same, the above obligation to be in full force ; otherwise to be void. .

" ' H. W. EVANS, [SEAL.]<br>
*President of the Union Bank of Maryland.*<br>
R. MICKLE, [SEAL.]

" ' Signed, sealed, and delivered in presence of<br>
CH. A. WILLAMSON.'

" Whereupon the plaintiffs closed their testimony ; and the defendant prayed the court to instruct the jury that, on the evidence aforesaid, if believed by the jury, the plaintiffs are not entitled to recover the said item of $ 2,088.61.

" And the court, being of the opinion that, by the evidence aforesaid, it appeared that the former Postmaster-General (Barry) had, within the scope of his official authority, and with full possession of the facts involved in the case, adjudicated the question of the right of the defendant to receive the said item of $ 2,088.61, and, under the said adjudication, the same had been paid to the defendant, and that this court has no authority to review and reverse the said adjudication for errors of law therein, and that, from the evidence aforesaid, the jury cannot infer mistake of fact, collusion, or misconduct of the said Postmaster-General, gave the instruction as prayed, to which instruction, as given, the plaintiffs excepted.

" The defendant having admitted the receipt by him of the sum of $ 2,500, as charged in plaintiffs' account, offered and read in evidence an account presented by him to the Department, claiming sundry allowances as for commission for the disbursement of sundry sums made by him from the contingent fund of the Post-Office Department, and for the like commissions on the sum of $ 190,000, being the amount of sundry loans negotiated by him, at the request of the Postmaster-General, for the use of said Department, as charged and claimed in said account, and then gave evidence tending to prove, by credible and competent witnesses, that he, the said defendant, while chief clerk of the Post-Office Department, was employed by the said Postmaster-General to negotiate said loans ; that he faithfully performed that duty, and did negotiate the several loans for the sums with the parties, and at the times mentioned in the items of charge in his account. He further gave testi-

mony tending to show that no loans were ever made and nego-
tiated by or for the use of the Department, except during the
period when Major Barry held the office of Postmaster-General,
and that no other officer or clerk attached to the General Post-
Office had ever been employed in the negotiation of any loans
for the use of said Department; that during the same period of
time another person, viz. Samuel L. Governeur, then postmas-
ter at New York, was, in like manner, employed to negotiate
similar loans for the use of said Department, as a srecial agent;
that loans were thus negotiated by said Governeur, as such
special agent, sometimes at a very high premium, on one occa-
casion paying for the same at the rate of three per cent. per
month, besides collateral advantages to the lender; that for the
loans thus negotiated by said Governeur he claimed and was
allowed five per cent. commission when he lent his own per-
sonal responsibility, and two and a half per cent. when he in-
curred no responsibility; and these commissions were allowed
and credited him by the Department in the settlement of his
accounts; that the defendant, in the negotiations intrusted to
him, went personally to Baltimore and Philadelphia, where the
same were conducted and effected, and that he has never re-
ceived any remuneration for his services, or for his expenses in
attending to said business.

"The defendant further gave parol evidence, tending to
show that no negotiations of loans, other than those made by
the defendant, were ever made by the Post-Office Department,
or by the Department's chief clerk, and such duties had never,
before or since, been performed by any other chief clerk or treas-
urer, and that if any other person had been employed to perform
said business, not connected with the Department, such person
would have claimed and received a compensation of two and
a half per cent. commission on the amount so borrowed.

"And thereupon, the plaintiffs offered further evidence to
prove that, during all the time aforesaid in which the loans
aforesaid were negotiated by the defendant, he was chief clerk
and treasurer of the Post-Office Department, and as such re-
ceived a stated salary fixed by law, and, as treasurer, had charge
of the financial duties of the Department; that the general out-
line of his duties is stated in the published rules and regula-
tions of March 4, 1833, issued by the Postmaster-General, but
there were other minor duties for which there were verbal di-
rections; that the disbursements of the contingent expenses of
the Department, and the settlement of accounts therefor at the
Treasury, down to the year 1815, had been by the Post-
master-General, and since that year by officers of the Depart-

ment assigned to that duty in addition to their other duties; that the defendant was disbursing agent from 1829 to some time in February, 1835, and as such settled quarterly accounts of his agency at the Treasury; that no allowance had ever been made for such services beyond the stated salaries of the officers, and none had been asked for by any officer except by the defendant, long after he had settled his accounts, and had retired from office; that before, and during, and ever since the years 1833 and 1834, in which said loans were negotiated by defendant, it was the frequent usage of the Department for the Postmaster-General to send its officers to points of the country distant from the office, on special business connected with their respective branches of the service, and they had never claimed or been allowed any compensation therefor, except their actual expenses, in addition to their stated salaries, which continued to run on during their absence, and that no distinction was known or recognized in this respect between the financial and other divisions of the department; that during his treasurership the defendant had made no claim for commissions on the loans aforesaid made by him; that his predecessor in charge of the financial department was the First Assistant Postmaster-General, who held the office during several years, down to March, 1843, and during that time, by direction of the Postmaster-General, negotiated with distant banks for permission to make two overdrafts, of $50,000 each, for which interest was to be allowed, and which were to be repaid by deposits of the revenues of the Department, as collected; that he rendered these services, as essential portions of his duties, under charge of the financial division of the Department, and never expected to receive any compensation therefor beyond his regular salary; that no other loans are known to have been negotiated by the Department, nor are commissions known to have been allowed to officers of the Department for any special services rendered by them for the Department; and further offered evidence to prove, that in the Treasury Department the contingent expenses and salaries of officers, amounting to the monthly sum of $70,000, were always disbursed by officers of the Treasury assigned to the duty, in addition to their ordinary duties, without any charge or claim of extra compensation; and that officers of this Department were sent on missions to New York connected with public loans, and were never allowed any compensation beyond their expenses.

"And the defendant further gave evidence tending to prove, that the arrangement made for the overdrawing of the $50,000, made by the First Assistant Postmaster-General, was performed

through the instrumentality of an agent in New York, acting under instructions from said assistant; that it was not regarded as a loan, but as an agreement, upon the promise of regular deposits, sometimes leaving large balances in favor of the government to meet and pay the drafts of the Department, in case no funds belonging to it were at the time in deposit, to the extent of $ 50,000; that the defendant had made similar arrangements for the Department with other banks, at different times, to the amount of $ 500,000, and had never claimed compensation for this as an extra service, or received any such compensation therefor.

" Upon the whole of the evidence, so given by the parties respectively, the counsel for the United States prayed the court to instruct the jury as follows, viz. : — That on the whole of said evidence, if believed by the jury, the plaintiffs are entitled to recover the said sum of $ 2,500, and that defendant is not entitled to set off against that item any value of his services in negotiating said loans, or for the disbursement of the contingent fund, as claimed by him in his said account.     To the giving of which instruction, the defendant, by his counsel, objected, but the court overruled the objection, and gave the instruction as prayed; to which ruling of the court the defendant excepted."

The inquiries arising upon this record involve, to some extent, an examination of the powers and duties of the Postmaster-General in the administration of his office, and embrace also a construction of the seventeenth section of the statute of June 2, 1835, with respect to the directions to the Postmaster-General to prosecute for any of the delinquencies or misfeasances enumerated in that section; they imply, moreover, an examination on the part of this court as to how far the acts of the defendant below, as characterized by the proofs on the record, fall within either category of a payment out of the funds of the Post-Office Department under pretence of services which have not been performed, — or of an allowance for services actually performed, exceeding the compensation permitted by law, — or of money paid over to a person in consequence of fraudulent representations, — or by mistake, or collusion, or misconduct of any officer or clerk of the Department.

Without undertaking, in the solution of these inquiries, to define with perfect exactness the powers of the Postmaster-General, or to deny or affirm any implied general power in that officer to make loans on the credit or responsibility of the government, we think it may be safely assumed that such a power, if vested in that officer, must be limited to acts inseparable

from the exigencies of the Department over which he presides; acts necessarily incident to its regular, legitimate operations. It never can be extended to a right in the Postmaster-General, at his discretion, to contract loans, or to borrow money upon mere calculations of contingent or speculative advantage to the Department; much less can it embrace the right in this officer to deal *ad libitum* in stocks, or bonds, or evidences of debt, or in certificates of deposit, either with corporations or individuals, when these subjects of traffic can in no wise be connected with the necessary or beneficial operations of the Department, nor can, indeed, be in any sense connected with that Department, except to render the latter a guarantee for the profit of others, with whom such transactions may take place.

Under the principles here assumed, and which are deemed by this court to be undeniable, let us look more nearly at this payment of $2,088.61, made by order of the Postmaster-General, to the defendant, and at the circumstances under which it was made, in order to ascertain how far such payment, and the retention of the amount by the defendant, are warranted by these principles. It should here be borne in mind, that for some time previously, and to a period of nearly eleven months after the failure of the Bank of Maryland, the defendant was not only the chief clerk, but the treasurer, of the Post-Office Department. He was, therefore, necessarily acquainted, not only with the internal details of the Department, and clothed with the control of its pecuniary operations, but was also acquainted with the condition and character of those from whom loans to the Department were obtained; indeed, he assumes much credit to himself for this knowledge, and his acts based upon it, and makes them in part the foundation of his claim for commissions on the moneys he had negotiated. But in addition to this implication, it is stated in the proofs that the Post-Office Department was informed, in March, 1834, of the failure of the Bank of Maryland; and that as early as the 8th of April following, both the Department and the defendant were notified of the assignment to the Union Bank of the Post-Office certificates for $50,000. However possible it may be, that the head of the Department remained individually ignorant of the several occurrences above mentioned, they warrant a fair, nay, a necessary, legal conclusion to affect him with every consequence deducible from facts which it was within the range of his duty to know. But whatever suppositions may be indulged with respect to the head of the Department, they cannot avert from the defendant the consequences of acts notoriously, designedly, and personally performed by himself.

42 *

Thus situated, — under these striking facts and circumstances, — being still the chief clerk and treasurer of the Department, with full knowledge of the failure of the Bank of Maryland, and of the transfer to the Union Bank of the certificates of debt for $ 50,000, the defendant himself withdraws his depreciated certificate of deposit from the insolvent Bank of Maryland, and on the 9th day of September, 1834, more than five months after the failure of that bank, transfers it, with the interest which had accrued thereon, to the Post-Office Department at par. It is true he does not sign the order for the payment to himself, for he had a few days previously withdrawn from his situation in the Department, but he obtained from the Post-master-General a requisition on the acting treasurer of the Department for payment, and obtained on the 19th of February, 1835, a check from that acting treasurer for the amount of his depreciated certificate, with the interest thereon, at par, and received payment at that rate. Upon considering the position laid down by the Circuit Court, that this transaction was within the scope of the official authority of the Postmaster-General, we are irresistibly led to inquire, What could have been its object? Could this possibly have been to improve the credit or to facilitate the operations of the Department? If so, how could either of these ends be promoted by wasting the money of the government, that it might become the holder of a claim upon a notoriously insolvent corporation? Could the object have been to possess a set-off against the claims held by the Union Bank? If so, then surely the defendant should have been allowed nothing beyond the value of the certificate procured from him, and that was literally nothing. If we could impute to the head of the Department the design to favor a subaltern in office, this too would be equally irregular and inadmissible with either of the solutions above suggested. In no view of this transaction have we been able to regard it as falling within the scope of the Postmaster-General's authority. On the contrary, it has appeared to us as illegal and irregular, and, so far as the head of the Department was concerned, as perhaps flowing either from want of information, or from the absence of vigilant personal supervision of the details of office, and of the conduct of inferior agents. But whatever may be the true explanation of the course of the Postmaster-General, that explanation can have no bearing in justification of the conduct of the defendant, or in support of his pretension to withhold from the government the amount paid for his certificate. As the immediate actor throughout this transaction, giving it form and direction in all its progress, he could not but know the

right in which he held the certificate of deposit in the Bank of Maryland. He could not but know the failure of that bank, and the consequent worthlessness of the certificate held by, him, and the injustice and fraud of the contrivance by which he palmed that certificate upon the government, and obtained thereby the amount of it at par. In this view of the transaction, we consider the payment to the defendant of the sum of $2,088.61, by direction of the Postmaster-General, as illegal and void, and the case of the defendant as coming regularly within the meaning of the provision, which is mandatory in directing proceedings like the present for the recovery of moneys of the Department that have been paid over to any person in consequence of fraudulent representations, or by mistake or misconduct of any officer or clerk of the Department, and therefore as rendering the defendant liable to refund the amount so paid to him, with interest thereon.

In the decision of the Circuit Court upon the prayer to the second bill of exceptions, sealed at the instance of the defendant below, this court can perceive no error. Upon adverting to the printed rules and regulations for the government of the Post-Office Department adopted on the 4th of March, 1833, and referred to in the defendant's exception, we find in the eighth rule the following provision : — "The third division will be that of finance, under the superintendence of the chief clerk, Obadiah B. Brown, who shall be treasurer of the Department. There shall be under his control the book-keeper's, the solicitor's office, and the pay office."

The language of this rule, if standing singly, must be understood as sufficiently comprehensive to embrace every thing relating to finance, — to the fiscal concerns of the Department ; and it must be perceived, too, that all the functions and duties comprehended within this rule are attached to the office of chief clerk. It is as chief clerk, and by virtue of his office of chief clerk, that the entire subject of finance and financial administration is devolved on him. The only singularity marking this arrangement is the fact of its associating the powers and duties created by it peculiarly with this defendant individually, by declaring that the division of finance shall be under the superintendence of the chief clerk, O. B. Brown.

But beyond this general provision, contained in rule eighth of the Post-Office regulations, it will be found on examination that the whole of the remaining rules, extending to number twenty-four, are made up of a detail of duties to be performed with respect to receipts, deposits of money, payments and disbursements, by this treasurer, so constituted in virtue of his

office of chief clerk; for which last office he received a stated salary. By what course of reasoning, then, it could be shown that the peculiar or appropriate duties of this officer were not his duties, but were performed by him in lieu of some other agent, and became, therefore, the foundation for extra compensation, this court are unable to comprehend. Some instances of extra compensation allowed at the Department have been adduced in support of the claim of the defendant to commissions in this case, and several authorities have been cited from this court, which are supposed to tend to its establishment. With respect to the former, this court cannot consider them as entitled to the smallest weight; we feel bound to regard them as wholly irregular, and as examples rather to be censured and shunned, than as precedents to be approved and followed. Between the cases of The United States *v.* Ripey, of The United States *v.* Macdaniel, of the same *v.* Fillebrown, relied on for the defendant, and that now before us, we can discern an obvious distinction. Without undertaking here to discuss the force of those decisions as authority upon this question, we may safely say that they were commended to the judgment of this court by the conviction that they were founded on services which appertained not to the regular official stations and duties of the claimants, — services, too, actually performed, and untinged by any hue or shade of contrivance or *mala fides*, and really beneficial in their character to those for whom they were performed. We deem it unnecessary further particularly to contrast those claims with that of the defendant in the case before us. But whatever may have been understood to be decided, or whatever may in truth have been decided, by the cases above mentioned, the principles established by this court in the decisions of Gratiot *v.* The United States, 4 Howard, 80, and of The United States *v.* Buchanan, decided, during the present term of this court, we consider as furnishing the true rule as to allowances for extra services; by that rule, we conceive that the pretension of the defendant to commissions on loans, as set forth in the proceedings in this case, must be utterly condemned. This court, therefore, approving of so much of the decision of the Circuit Court as disallowed those commissions, do hereby adjudge that the writ of error of the defendant below to this decision be dismissed; and disapproving as erroneous so much of the judgment of the Circuit Court as authorizes the said defendant to claim against the United States the amount of the certificate of deposit from the Bank of Maryland transferred by him to the Post-Office Department, we hereby adjudge and order, that this judgment be reversed, and that this

cause be remanded to the Circuit Court, to be proceeded in conformably with the principles herein above declared.

### Order.

This cause came on to be heard on the transcript of the record from the Circuit Court of the United States for the District of Columbia, holden in and for the County of Washington, and was argued by counsel. On consideration whereof, it is now here ordered and adjudged by this court, that the judgment of the said Circuit Court in this cause be, and the same is hereby, reversed, and that this cause be, and the same is hereby, remanded to the said Circuit Court, with directions to award a *venire facias de novo*, and for such further proceedings to be had therein as may be in conformity to the opinion of this court, and as to law and justice may appertain.